**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-403 (CRC)** |
| **v.** | : | |
| | : | |
| **MATTHEW HUTTLE,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Matthew Huttle to 10 months of incarceration, one year of supervised release, $500 restitution, and 60 hours of community service. The government's recommended sentence is slightly above the midpoint of the 6 to 12-month guideline range calculated by the United States Probation Office and estimated by the parties in the guilty plea agreement.

### I.    Introduction

Defendant Matthew Huttle, age 41 and a journeyman carpenter,  participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Huttle pled guilty to Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). The government's recommended sentence is warranted because (1) as Huttle approached the Capitol building, he vocalized his intent to enter the Capitol building despite acknowledging that police officers were guarding the area and the area was closed; (2) he was at the forefront of violence when rioters overwhelmed and overran the police line on the West Front; (3) he joined the mob as rioters, his co-defendant included, berated officers while violently attacking them; (4) he entered the Capitol building and, while inside, directly disobeyed officers' orders to leave; (5) while inside the Capitol building, he assisted rioters searching for members of Congress, by directing the rioters to the third floor; (6) he entered a private room inside the Capitol building; (7) after exiting the Capitol building, he remained on the Capitol grounds for several hours, taking photos and videos of the rioters occupying Capitol grounds; and (8) he has an extensive criminal history that demonstrates a pattern and practice of disrespecting and disobeying the rule of law, which is consistent with his actions on January 6, 2021.

The Court must also consider that Huttle's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Huttle's crime support a sentence of 10 months of incarceration in this case.

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 39 at 1-3.

*Huttle's Participation in the Riot*

Huttle traveled with his uncle, co-defendant Dale Huttle, to Washington D.C. from Hobart, Indiana, to attend the former President's "Stop the Steal" rally by the Ellipse. *See* ECF No. 39 at ¶¶ 8, 9.  On January 6, 2021, Huttle wore dark pants, a black coat, a black neck gator, and a grey beanie bearing a Carhart logo.



*Images 1 and 2: Photos of Huttle on January 6, 2021*

After attending the rally, Huttle and his uncle marched towards the U.S. Capitol. Huttle recorded the trek to the Capitol.



*Image 3: Screenshot of Huttle's video recording showing his march to the Capitol*

When the Capitol was in sight, Huttle declared, "We're going to see if we can get inside." Exhibit 2 at :25. As they approached Capitol grounds, Huttle told his uncle, "We're going to be stopped here, I don't think we're going to get close. We're going to have to go around the side, huh . . . . Cops, a lot of cops." Exhibit 2 at 4:25. His uncle responded, "I think we ought to bum rush the Capitol building! Arrest them all! We've got enough people to do that." Exhibit 2 at 4:43. Huttle said, "let's see – uh – if we can get close here."



*Image 4: Screenshot of Huttle's video recording as he and his co-defendant spoke about entering the Capitol*

Around 2:00 p.m., Huttle entered restricted Capitol grounds and joined a mass of rioters on the West Plaza. Huttle commented that there were "a lot of cops up on the stairs. . . . I think those are Secret Service. And Capitol Police." Exhibit 4 at 2:00. He said, "this is going to get bad." Exhibit 4 at 2:39.

As he got closer to the building, Huttle used his cell phone to record the chaos around him, including flash bangs igniting, chemical irritants in the air, rioters climbing the construction scaffolding, and the mob angrily demanding entrance to the building. In his video, after hearing a loud flash bang, Huttle asked, "What are they shooting, a canon?" and he acknowledged that he felt tear gas in the air. Exhibit 5 at :09. Rioters around him chanted "USA USA USA!" As he faced the Capitol building, Huttle exclaimed, "Some people just stormed it and got beat up and

maced. . . . They beefed up the line, these are all cops up front." and other rioters nearby yelled "Breach it!" Exhibit 3 at :02.



*Image 5: Screenshot of Huttle's video recording showing the chaos around him on Capitol grounds*

Despite all the warnings that he should have left, Huttle, still with his uncle, marched towards the police line. When the pair reached the front of the pack of rioters and faced police officers, Huttle stood next to his as his uncle yelled at and berated officers protecting the Capitol, saying things like, "You guys need to be patriots! Be Americans! Your country is being stolen!"; "You can't stop a million of us! We're taking this house, just so you know"; "Didn't you take an oath? You're serving the enemy."; "How will you be able to sleep tonight?"; and "Congress is a

bunch of traitors at this point they stole our country from us!" Huttle's uncle then leaned over to

Huttle, pointed at the Capitol building, and said, "We're going in the front door!"



*Image 6: Screenshot of body worn camera footage showing Huttle (circled in red) facing police officers as his co-defendant (circled in yellow) berates police officers*

As rioters continued to confront the vastly outnumbered line of officers, officers attempted

to disperse the crowd using munitions. Huttle observed the chaos and commented that people were

"getting gassed." Moments after, a violent clash broke out between rioters and police officers –

right in front of Huttle.

With Huttle at the forefront, the rioters successfully overran the police line on the West

Plaza. The police officers fell back and retreated towards a temporary staircase that led to the

Lower West Terrace. The officers were in a precarious position – cornered with a wall at their

back and an angry mob at their front. Their only escape was the narrow staircase. Some officers

fended off rioters as other officers escaped up the staircase. Rioters threw objects at the now-

cornered police line. Huttle and his uncle approached these officers. Huttle's uncle attempted to

disarm an officer of his baton, but the officer successfully pulled away and maintained hold of his baton.

After witnessing numerous violent clashes between police officers and rioters, Huttle ascended to the Lower West Terrace and marched towards the Senate Wing Door. He recorded rioters rushing into the building through the Parliamentarian's door and he said, "We're going in."



*Image 7: Screenshot of Huttle's video recording showing smashed window as he entered the Capitol through the Senate Wing Door*

Huttle entered the Capitol building at 3:04 p.m. through the Senate Wing Door. As he entered, sirens blared overhead, broken glass scattered the floor from the violent entry, and rioters yelled and chanted. Huttle recorded a video showing the door that he entered through had shattered glass, and he watched as rioters climbed into the Capitol building through a shattered window.



*Image 8: Screenshot of Capitol surveillance footage showing Huttle (red circle) entering the Capitol building*

Once inside the Capitol, Huttle – who continually recorded his actions while inside the Capitol building – said, "smells like a lot of weed in here. Everyone is smokin' weed." Huttle continued towards the Crypt. Along the way, he approached a police officer. Another rioter asked the officer, "What do you think about Pence?" The officer responded, "I don't have any comment." The other rioter said, "I mean, what do you think about this – this is a bunch of fucking bullshit! I've never heard such bullshit in my life!" and Huttle asked, "has this ever happened before to you guys?" The officer walked away and Huttle initially followed him, but then turned around.



*Image 9: Screenshot of Huttle's video recording showing him approaching and questioning a police officer (Ex. 1 at 1:00)*

Huttle marched into the Crypt where rioters were chanting "USA USA USA!" Huttle approached a group of rioters piling into an elevator. One of those rioters asked, "What floor are they on?" Huttle replied, "Third, right? and then asked a police officer, "Did they go through the basement?" Exhibit 1 at 2:45. As the other group of rioters went up the elevator, Huttle said, "they went up; third floor, to the offices."

Huttle then entered a private conference room S-145, alongside another rioter yelling, "This is Day One of the revolution!" Exhibit 1 at 4:45. Huttle peered out of a shattered window in the office and looked towards police officers outside. Huttle said, "this is the front! This is the front of the building! That broken window . . . millions of people out here. we're inside, they've got the whole place surrounded!" Exhibit 1 at 4:50.



*Image 10: Screenshot of Huttle's video recording showing him peering through a window at officers outside the Capitol (Ex. 1 at 5:04)*

As Huttle exited the room, he said, "I've been maced, gassed . . . can barely breathe."

Exhibit 1 at 5:40. Huttle turned the camera to himself and said, "this is me." Exhibit 1 at 5:53.

Huttle walked back to the Crypt and joined rioters chanting, "WHOSE HOUSE? OUR HOUSE!"



*Figure 11: Screenshot of video footage showing Huttle (red circle) roaming through the Crypt*

After walking near the Memorial Doors, past the House Wing Doors, and through several hallways, Huttle was intercepted by police officers who attempted to direct him out of the building. Huttle refused to comply. He said, "I think that's a trap" and said that he had a "bad feeling" about the officers trying to get all the rioters out of "one door." After watching officers corral rioters out of the building and refusing to go with the officers, Huttle scurried away from the police officers. Huttle eventually made it back to the Senate Wing Doors and exited the Capitol by climbing out of a window. Huttle was inside the Capitol building for 16 minutes.

After leaving the Capitol building, Huttle remained on Capitol grounds for several hours. He continued to take photos and videos of the rioters occupying Capitol grounds.



*Image 12: Photo from Huttle's phone showing Capitol building in the evening*

*Defendant's Interview*

Pursuant to his plea agreement, Huttle gave an interview to the FBI. In the interview, Huttle explained that he traveled to Washington, D.C. with his uncle, Dale Huttle. On January 5, 2021, the pair walked around the Capitol and took photos. On January 6, 2021, Huttle attended the Stop the Steal rally with his uncle and then marched towards the Capitol. Huttle acknowledged that as he neared the Capitol, people were acting "crazy" and described the scene as total chaos. Huttle stated that he only decided to enter the Capitol building once the doors were open, and stated that he did not remember saying they should "see if they can get inside" as he marched towards the

Capitol. *See* Exhibit 2 at :25. He saw people tearing down railings and police officers using chemical irritants, which he also felt the effects of. Huttle admitted that he saw a broken window at the door where he entered. He described the scene as "quiet" when he entered. *But see* Exhibit 1. Huttle acknowledged that when other rioters asked him where members of Congress were, he directed them to the third floor. He stated, however, that he only said this because he was trying to "divert" rioters away from the congresspeople, who were likely evacuating the building in underground tunnels. When asked about his co-defendant's interactions with police officers, Huttle claimed he could not see or hear the interactions because everyone was yelling at the police officers. Huttle admitted to deleting some of his video footage because of the "trouble" that occurred on January 6. Huttle claimed that his only purpose of being at the Capitol was to record video to show possible government corruption. Huttle believes that the FBI was responsible for the Capitol riot and explained that he saw actors attacking the Capitol who appeared to have too much training to be civilians.

*The Charges and Plea Agreement*

On December 14, 2022, the United States charged Huttle and his uncle in a 12-count Indictment. Huttle was charged with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1);  Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Disorderly or Disruptive Conduct in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(2)(G).

On August 10, 2023, pursuant to a plea agreement, Huttle pleaded guilty to Count Eight of the Indictment, charging him with a violation of 18 U.S.C. § 1752(a)(1).[2] By plea agreement Huttle agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Huttle now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, Huttle faces up to twelve months of imprisonment and a fine of up to $5,000. Huttle must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation of the Total Offense Level set forth in the PSR, which mirrors the calculation set forth in the parties' guilty plea agreement:

| | | |
|---|---|---|
| Base Offense Level | U.S.S.G. §2B2.3(a) | +4 |
| Specific Offense Characteristics | U.S.S.G. §2B2.3(b)(1)(A) | +2 |
| Acceptance of Responsibility | USSG §3E1.1(a) | <u>-2</u> |

---

[2] The case against Hutton's uncle, Dale Hutton, is still pending, with a status conference listed on November 30, 2023.

Total Adjusted Offense Level                                           4

*See* PSR at ¶¶ 40-48.

Section 4C1.1 does not apply in this case because Huttle does not meet the criteria. Specifically, § 4C1.1 only applies if "the defendant did not receive any criminal history points from Chapter Four, Part A." U.S.S.G. § 4C1.1(a). As explained below, the government and probation have calculated Huttle's criminal history score at 14 points.

The U.S. Probation Office calculated Huttle's criminal history as Category VI. PSR at ¶ 6. Accordingly, the U.S. Probation Office calculated Huttle's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 6-12 months. PSR at ¶ 102. Huttle's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 10 months of incarceration.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Huttle's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Huttle, the absence of violent or destructive acts is not a mitigating factor. Had Huttle engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Huttle's case is his relentless intent on getting into the Capitol building. From far away from the Capitol building, Huttle recognized the officers standing guard and expressed concern that those officers might prevent his entrance. But Huttle was resolute on entering; he quickly made it through thousands of rioters to the front of the mob and he watched as rioters close by violently attacked the officers. As soon as his opportunity came, Huttle marched to the Capitol building and entered. While inside, he ignored officer commands and he assisted other rioters trying to find lawmakers. He then remained on Capitol grounds for several hours, reveling in the chaos.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Huttle's History and Characteristics

As set forth in the PSR, Huttle's criminal history is extensive, *see* PSR pages 9-21, and he has demonstrated a repeated and complete disregard for the law. Huttle has been engaged in

numerous instances of violence, including battery. PSR ¶ 55.[3]  Huttle has repeatedly been arrested for driving while intoxicated and operating a vehicle as a habitual traffic offender as a result of the DUIs, and most of these arrests have resulted in conviction. *See* PSR ¶¶ 50, 52, 54, 56, 57, 59, 60, 66, 74, 79, 80, 82. Huttle's criminal history also includes conversion, PSR ¶ 51; disorderly conduct, PSR ¶ 53; and failure to return to lawful detention, PSR ¶ 58. He was charged with resisting law enforcement on three separate occasions, PSR ¶ 73, 78, 84; attempted aggravated battery, PSR ¶ 77; and domestic battery, PSR ¶ 81; however, all of these charges were eventually dismissed. *Id.* Likewise, he has been arrested for public intoxication on multiple occasions, PSR ¶¶ 72, 75, 64; harassment, PSR ¶ 83; and criminal mischief, PSR ¶ 76; although these charges were also eventually dismissed.

Additionally, Huttle is currently facing charges for disregarding oncoming traffic and almost causing an accident as he displayed signs of intoxication, refused field sobriety tests, and alcoholic beverages were in plain view within the vehicle. ECF No. ¶ 66. And Huttle has four other pending charges – all based on conduct that occurred after the instant offense. *See* PSR ¶¶ 67, 68, 69, 70.

Since he was arrested in the instant case, Huttle has violated his conditions of pre-trial release by using marijuana, ECF No. 29; and by failing to appear for drug testing, relocating to a different state prior to receiving approval, and providing inaccurate information to pretrial services,  ECF No. 31 at 2.

---

[3]  According to the stipulated factual basis for the guilty plea in that case, Huttle spanked his three-year-old son so hard that he left bruises all over the child's backside and the child's neck, and the child had such extreme pain on his backside that he could not sit properly for a week.  Huttle was sentenced to 2.5 years of imprisonment.

A criminal history of this length and variety demonstrates a longstanding lack of respect for the law and the need for specific deterrence in the form of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic

processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

As discussed above, Huttle's criminal history category of VI, the result of his history of prior arrests and convictions, and his ongoing present criminal conduct, reveal a clear pattern of disrespect for the law. *See* Section V(B) *supra.* In addition to the present case, Huttle is facing charges in five pending cases in Indiana. His pattern of violent conduct, disregarding and disrespecting law enforcement, and repeated criminal conduct that puts the lives of others directly at risk, is the utmost concern.

Moreover, although Huttle accepted responsibility by stipulating to the facts underlying his guilt and resolving this case via a plea, his post-plea interview – where he declined to express any remorse or acknowledgment of wrongdoing for his or others' actions and, in fact, continues to place blame on the government for instigating the riot as an undercover job – is troubling. As is Huttle's refusal to acknowledge many of the comments that he made – captured on his own videos – from January 6, including when he declared that they should try to get into the Capitol as they approached the restricted perimeter.

With the 2024 presidential election approaching and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of the political violence of January 6 looms ominously. This defendant has demonstrated an utter disregard for the rule of law, and thus this Court must sentence Huttle in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Huttle based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Huttle has pleaded guilty to Count Eight of the Indictment, charging him with 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case, taking into account Huttle's extensive criminal history.

In *United States v. Rivera*, 21-cr-60 (CKK), the defendant was convicted of four misdemeanor charges following a bench trial. While on Capitol grounds, Rivera, like Huttle, filmed the chaos around him, including the assault on the police at the Lower West Terrace as they

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

attempted to hold off rioters who were trying to get to the Upper West Terrace. Rivera continued filming the assault on police as their line gave way and encouraged rioters climbing the walls to the Upper West Terrace. Like Huttle, Rivera also made a concerted effort to go to the front of the mob breaching the Senate Wing Door and then entered the building. Rivera spent a comparable amount of time inside the building as Huttle – 20 minutes, whereas Huttle spent 16 minutes – and, like Huttle, he video recorded much of his time in the building. Also like Huttle, after January 6, Rivera did not demonstrate remorse or contrition for his acts. Rivera was sentenced to 8 months' imprisonment. However, Rivera was criminal history Category I, whereas Huttle is VI and, thus, a longer sentence is warranted for Huttle.

In *United States v. Harris*, 21-cr-274 (RDM), defendant Harris entered the restricted grounds on the West Front of the Capitol and, like Huttle, moved near the front of the barricade line on the Lower West Terrace where he witnessed violence between other rioters and police officers. Harris observed the breach of the Upper West Terrace Door and entered the Capitol building through that door shortly after. While inside the Capitol, Harris roamed to several locations. Like Huttle, Harris refused police officers' commands to leave the Capitol and stayed inside until he and other rioters were forced out. After January 6, Harris did not express remorse for his actions. Harris was sentenced to 7 months of incarceration. However, Harris was in criminal history Category I, whereas Huttle is in Category VI and, thus, a longer sentence is warranted for Huttle.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property . . . including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Huttle must pay $500 in restitution, which reflects in part the role Huttle played in the riot on January 6.[6] PSR ¶ 9. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Huttle's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 122.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Huttle to 10 months of incarceration. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Huttle's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ *Ashley Akers*
Trial Attorney
MO Bar No. 69601
United States Attorney's Office
District of Columbia
601 D Street NW
Washington, D.C. 20001
Phone: 202-353-0521
Email: Ashley.Akers@usdoj.gov

---

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).